# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| David Carlson, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 13 CV 50341 |
| v. | ) | |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, David Carlson, brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision denying him social security disability benefits. For the reasons set forth below, the decision is remanded.

## I. BACKGROUND[1]

On March 6, 2009, Plaintiff filed an application for supplemental security income and disability insurance benefits, alleging a disability beginning on June 15, 2006. R. 251-55, 269-70, 391. Plaintiff asserted the following impairments: deep vein thrombosis ("DVT") of the left leg, obesity, Klinefelter syndrome,[2] adjustment reaction of adulthood with mild depression, estimated borderline to low average

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.

[2] Klinefelter syndrome is a chromosomal abnormality where males are born with 47 chromosomes instead of 46, which causes a hormone imbalance due to the decreased production of testosterone. R. 424-25. The four most common conditions related to Klinefelter syndrome are sterility, breast development, incomplete masculine body build and social and/or school learning problems. R. 424; *see also* R. 419-421.

intellectual functioning and a possible personality disorder with antisocial features. R. 394. Plaintiff was 38 years old at the time of the alleged onset date and last engaged in substantial gainful activing in 2006. R. 13, 251, 362. On July 13, 2012, the Administrative Law Judge ("ALJ") held a hearing to review the Social Security Administration's denial of Plaintiff's request for benefits. R. 26-81. The same attorney representing Plaintiff in this action also represented him at the hearing. Plaintiff, Medical Expert Dr. Ronald Semerdjian and Vocational Expert Lisa Gagliano ("VE") testified at the hearing.

At the hearing, Plaintiff testified that he was 6 feet four inches tall and weighed 368 pounds. R. 40. He graduated high school with special education support because he suffered from a learning disability as a child. R. 31, 48. Plaintiff testified that he lost his driver's license in 1994, and he has since relied on his mother, friends and public transportation to go places. R. 31-32.

Plaintiff has had the blood clot in his left leg since 2009. R. 36-37. He testified that due to the clot, sitting for any length of time cut off circulation to his leg. R. 36-37. To relieve this discomfort, Plaintiff would typically lay down for the remainder of the day. R. 47. Plaintiff testified about his other physical limitations, stating that he could only walk half a mile before he had to sit down. R. 41. He could only sit for approximately 30 minutes before he had to change positions or stand up and shake his left leg before he could sit again. R. 41, 47. Plaintiff testified that he could do a task for approximately five or ten minutes before he would have to take a break. R. 42. Plaintiff explained that since his blood clot in

2009, his leg had been swollen. R. 42. If Plaintiff did any walking, his leg would get even larger and it would get even more painful. R. 42. Plaintiff testified that he did not believe he would be able to work, noting that his leg was swollen during the hearing, which resulted in him having to remove his shoe. R. 44.

Plaintiff was also diagnosed with Klinefelter syndrome as a child. R. 30. This condition caused low testosterone production, which resulted in him having no motivation. R. 37. Plaintiff started testosterone replacement therapy at age 21. R. 48. However, Plaintiff explained that when he would lose a job and have no insurance, he would be unable to afford his testosterone therapy treatments. R. 37. According to Plaintiff's counsel's opening statement at the hearing, in 2006, Plaintiff was unable to continue testosterone replacement therapy due to financial constraints. R. 30. The lack of testosterone resulted in an extreme lack of motivation, sluggishness and fatigue, which prevented Plaintiff from working. R. 30. However, Plaintiff testified that he resumed taking testosterone replacement therapy in May 2012. R. 41-42. When taking testosterone, Plaintiff testified that he had more energy, but due to his obesity he was still in too much pain to do anything. R. 42.

In relation to his work history, Plaintiff testified that he typically had training periods of three to six months. R. 48. Plaintiff most recently worked for a friend in 2010 opening boxes for window treatments. R. 33-34. His friend gave him the job to get Plaintiff out of the house. R. 33-34. At the time of the hearing, Plaintiff was incarcerated at Taylorville Correctional Center for stealing a diamond

ring while working at this job. R. 32-33. Plaintiff testified that he was scheduled to be released in August 2013 and planned to live with his mother. R. 44. Since being at Taylorville, Plaintiff gained 50 to 60 pounds and noticed that his leg has gotten larger. R. 48-49.

Before the job with his friend, Plaintiff worked for Ed's Rental and Sales entering information into a computer to lease different types of equipment and party supplies to customers. R. 35, 38. Plaintiff had this job from 2002 until 2006, and the VE classified this job as medium exertion, semi-skilled work with a Special Vocational Preparation ("SVP") level of 4. R. 383, 398. Plaintiff testified that he quit this job because he did not like his boss. R. 38. Plaintiff explained that he had no problem performing his job at Ed's Rental, but would be unable to work there today because he would not be able to stand more than 20 minutes due to the blood clot in his left leg. R. 35-36.

In 2001, Plaintiff worked as a consulting engineer using a Troxler meter to check the soil for compression, density and moisture and then recording the data. R. 71, 383. The VE classified this job as light exertion, skilled work with an SVP of 5. R.398. Plaintiff also worked for Ogden Blinds, Inc. from 1999 until 2001 selling and installing window treatments. R. 43, 383. The VE classified the sales portion of this job as light exertion, semi-skilled work with an SVP of 3. R.398. The installation portion of the job was classified as medium exertion, skilled work with an SVP of 5. R. 398. The ALJ asked Plaintiff if he had "any problems understanding, remembering, and carrying out instructions," and Plaintiff

responded that he had "problems at some times, but not all the time." R. 43. Plaintiff explained that he could not always remember how to approach the customer and tell them what they needed for their home. R. 43. Plaintiff attributed this to his low testosterone and because he "just don't feel like doing it." R. 44.

Upon questioning by Plaintiff's counsel, Plaintiff testified that when he was on testosterone therapy, he often got angry and would "snap." R. 46. Plaintiff explained that he "exploded" on his boss at Ed's Rental. R. 46. A similar thing happened when he was a consulting engineer in 1999. R. 46, 383. To avoid this, Plaintiff would walk away from situations that aggravated him. R. 46.

The ALJ called Dr. Semerdjian to testify as an impartial medical expert in the field of internal medicine. R. 49. Upon questioning by Dr. Semerdjian, Plaintiff testified that while at Taylorville Correctional Center, he took Ibuprofen or Tylenol for his leg pain and was prescribed a stocking for his blood clot. R. 51. However, Plaintiff stated that he did not wear the stocking because it was uncomfortable. R. 51. Dr. Semerdjian testified that Plaintiff had two severe impairments, namely Klinefelter syndrome and DVT. R. 52. Dr. Semerdjian explained that the adverse effects of Klinefelter syndrome are mitigated with the use of testosterone. R. 52. A side effect of not getting the testosterone was truncal obesity, but not to the extent seen in Plaintiff. R. 52. Dr. Semerdjian testified that Plaintiff was diagnosed with Klinefelter syndrome at age 2, and he began receiving testosterone injections in 1991 at age 24. R. 53-54. He opined that injections were typically started earlier,

between the ages of 12 to 14, to preserve the secondary sex characteristics that most males have. R. 54.

As to Plaintiff's DVT, Dr. Semerdjian stated that early on in Plaintiff's treatment, he was not prescribed an anticoagulant on a regular basis, so his clot did not resolve completely. R. 53. Dr. Semerdjian opined that it was common for people with DVT to have residual swelling in the leg and support stockings were one method to treat it. R. 53. However, Plaintiff's obesity likely caused swelling in the lower extremities as well. R. 53. Dr. Semerdjian noted that Plaintiff went to the emergency room on February 27, 2009 (R. 445-50), complaining of pain in his left leg with swelling from the knee down. R.54. During that visit, Plaintiff had his first duplex venous scan and was diagnosed with a thrombosis or clot in his left leg. R. 54. Plaintiff refused admission at that time because he did not have insurance and was instead sent home with an injected and oral anti-coagulant. R. 54. Plaintiff returned to the emergency room on March 9, 2009 (R. 470-71), experiencing shortness of breath and discomfort in his leg. R. 54. Dr. Semerdjian testified that discomfort in the leg was not unusual that early in treatment, but it was determined that Plaintiff ran out of his injectable anti-coagulant because he was not using as it as prescribed. R. 54. Plaintiff returned again on April 5, 2009 (R. 433-41), with swelling in his leg, and it was determined that Plaintiff's international normalized ration ("INR"), which measures the effect of Coumadin in the blood, was 1.54 when it should have been between 2 and 3. R. 55. At that visit,

Plaintiff had his third and last duplex venous scan and the results were the same as the first two.  R. 55.

Dr. Semerdjian testified that at Plaintiff's physical examination, performed by state-agency physician Dr. Maria Vlahos on June 3, 2009 (R. 507-14), he was generally normal, except for dilated veins in his left lower extremity, which was likely a permanent condition that resulted from his previous thrombophlebitis.  R. 55-56.  Plaintiff's left leg was also swollen with some pitting, and he had tenderness in his left calf.  R. 56.  Plaintiff had a mild limp and decreased range of motion with his left leg due to discomfort, but he was not using an assistive device.[3]  R. 56.

Dr. Semerdjian testified that he considered Listing 4.11 for chronic venous insufficiency of a lower extremity and Listing 9.00 for endocrine disorders generally, but that Plaintiff did not meet or equal either of these listings.  R. 58-60.  He testified that there were ordinarily no side effects when taking testosterone replacement therapy.  R. 61.  Dr. Semerdjian testified that Plaintiff would likely continue to have chronic venous insufficiency in his left leg, but he recommended that Plaintiff use a compression stocking to minimize swelling.  R. 63.  Prolonged standing would likely result in discomfort due to increased swelling from gravity, but lying down would drain some of the fluid.  R. 63.  Dr. Semerdjian noted that Plaintiff's medical records referenced edema, but the records did not reference its severity.  R. 65.  Dr. Semerdjian opined that Plaintiff could stand two hours out of an eight hour work day and that lying down most of the day would not be necessary.

---

[3] A Physical Residual Functional Capacity Assessment was also provided by state-agency consultant Dr. Charles Kenney on June 26, 2009.  R. 516-23.

R. 65, 68.  However, without knowing the severity of Plaintiff's edema, Dr.

Semerdjian was unable to determine whether Plaintiff could stand and walk up to

six hours out of the day.  R. 65.  Dr. Semerdjian also opined that Plaintiff would be

capable of performing sedentary work with no limits on sitting because he would

only have to stand occasionally during the work day.  R. 65-66.

Upon questioning by Plaintiff's counsel about the edema, Dr. Semerdjian

stated that Plaintiff's medical records merely indicated that he had edema of the

lower extremity, but did not indicate the degree of severity of the edema.  R. 69.  Dr.

Semerdjian admitted that his opinion was based on the lack of evidence in the

record.  R. 69.  Dr. Semerdjian also testified that low testosterone may play a role in

Plaintiff's drive and motivation, but noted that Dr. Hilger's examination did not

report that Plaintiff was taking any psychotropic drugs.  R. 68-69.

In addition to the physical evaluation by Dr. Vlahos, state-agency

psychologist Dr. William Hilger evaluated Plaintiff on July 20, 2009.  R. 524-27.  Dr.

Hilger outlined Plaintiff's recent employment where he leased equipment, sold

window treatments and tested soil.  R. 526.  Dr. Hilger further noted that Plaintiff

was working successfully at the rental place, but quit his job after four years due to

a conflict with his boss.  R. 527.  Plaintiff reported that he had not had testosterone

treatments for six years.  R. 527.  Additionally, Plaintiff reported previously using

alcohol, cocaine and cannabis; however, he stopped using alcohol in 2009 and

cocaine and cannabis in 2003.  R. 527.  Ultimately, Dr. Hilger diagnosed Plaintiff as

having adjustment reaction with mild depression, borderline to low average

intellectual functioning, possible personality disorder with antisocial features and a history of poly-substance abuse. R. 527. Dr. Hilger assigned Plaintiff a Global Assessment of Functioning ("GAF") score of at least 60 to 65, but opined that due to Plaintiff's low testosterone, he had little motivation "to perform any work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaption." R. 527. Dr. Hilger suggested that Plaintiff resume testosterone therapy and "pursue more sedentary, clerical types of duties until his blood clot is resolved." R. 527. Dr. Hilger opined that "[l]ikely, if [Plaintiff] could get back on the testosterone patch, he would have the motivation and energy to even begin looking for work and resuming daily activities." R. 527.

On August 4, 2009, non-examining state-agency medical consultant Dr. Carl Hermsmeyer provided a Mental RFC and Psychiatric Review Technique. R. 529-31, 533-46. Based on Dr. Hermsmeyer's evaluation of the evidence, he opined that although Plaintiff had "problems with understanding, remembering and the ability to carry out detailed instructions, [he] retains the mental capacity to perform simple one and two-step tasks at a consistent pace." R. 531. Another state-agency consultant, Dr. Russell Taylor, later affirmed Dr. Hermsmeyer's Mental RFC and Psychiatric Review Technique. R. 553.

At the hearing, the ALJ also questioned the VE. The ALJ set out a hypothetical claimant who had a high school education and had no training to perform skilled work. R. 72-73. The claimant would not be able to walk or stand more than two hours out of an eight-hour workday, would he be able to sit six hours

while being allowed to stand for five minutes every two hours. R. 72-73, 75-76. The hypothetical claimant would also have restrictions on lifting, stooping, crouching, kneeling, balancing, unprotected heights, heavy equipment, operating machinery, ladders, ropes, scaffolds, power tools, sharp edges and slippery surfaces. R. 72-73. Based on this hypothetical, the VE opined that the claimant could not perform any of Plaintiff's past-relevant work. R. 73. However, the claimant could still perform the job of lampshade assembler (DOT 739.684-094), which was sedentary, unskilled work with a reasoning level and an SVP of 2. R. 73; Dictionary of Occupational Titles, *available at* http://www.occupationalinfo.org/73/739684094.html (last visited September 25, 2015). According to the VE, there were 2,400 lampshade assembler jobs available in Illinois. R. 73. In response to questioning by the ALJ, the VE also testified that if the claimant had to elevate his leg to waist level or lie down for half the day it would eliminate competitive employment in production work jobs. R. 74. Similarly, the claimant would not be allowed to remove his shoe while at work. R. 75. The VE also testified that a lampshade assembler would be required to independently understand, remember and carry out instructions and an employer would not tolerate the continued need to explain the job after 30 days of training. R. 77. In response to questioning by Plaintiff's counsel, the VE confirmed that a claimant would be allowed to stand for five minutes every half hour if he were able to maintain production and stay on task. R. 79. However, the need to stand and take a break could not exceed six minutes in an hour. R. 79.

On July 24, 2012, the ALJ issued his ruling finding that Plaintiff was not disabled. R. 11-19. The ALJ found that Plaintiff had not engaged in substantial gainful activity since Plaintiff's alleged onset date, June 15, 2006. R. 13. The ALJ also found that Plaintiff had the following severe impairments: hypogonadism secondary to Klinefelter syndrome, morbid obesity and peripheral vascular insufficiency with a history of DVT. R. 13. However, the ALJ determined that Plaintiff's alleged mental impairments, namely borderline intellectual functioning, adjustment disorder, possible personality disorder and substance abuse in remission, were not severe impairments. R. 14. The ALJ further explained that "[t]o the extent that the non-examining state agency medical consultants infer more than minimal functional impact due to mental health impairments (11F/3, 12F/11, 15F) their conclusions are inconsistent with actual work history discussed below and the clinical findings of the consulting psychologist who assigned a GAF of 65. Although the claimant receives prescription medication for problems unrelated to mental health, he has seen no prison psychologist and receives no psychotropic medications, which tends to underscore the probability that alleged mental health impairments do not result in more than minimal functional impact." R. 14.

The ALJ adopted the opinion of Dr. Semerdjian and found that Plaintiff's impairments did not meet or medically equal Listings 4.11 and 9.00. R. 15. The ALJ concluded that Plaintiff had the RFC to perform sedentary work with several exertional limitations. R. 15. Based on the VE's testimony, the ALJ determined

that Plaintiff could not perform any past-relevant work, but had the RFC to perform the job of lampshade assembler. R. 17-18.

## II. LEGAL STANDARD

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Additionally, as the

Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014) ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence – or even a preponderance of the evidence, as it is here – but still will be overturned if the ALJ fails to build a 'logical bridge' from the evidence to her conclusion." (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))); *Jensen v. Colvin*, No. 10 CV 50312, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2013).

## III. DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed or remanded because the ALJ: (1) failed to account for his mental impairments in the RFC determination; and (2) improperly analyzed his credibility by discounting his allegations of decreased motivation and left leg swelling.

## A. Mental Impairments and RFC

The ALJ found that Plaintiff had the RFC to perform sedentary work, but contrary to the opinions of the state-agency psychologists, he did not include any limitations for his mental impairments. Plaintiff challenges this finding, arguing that the ALJ improperly "played doctor" when he discounted his mental impairments and rejected the opinions of a state-agency examining psychologist (Dr. Hilger) and two state-agency consulting psychologists (Drs. Hermsmeyer and Taylor). Specifically, Plaintiff asserts that the ALJ mischaracterized Plaintiff's work history and failed to consider the effect of low testosterone on his mental

capacity when using this evidence to undermine the state-agency opinions. The Court agrees that the ALJ's characterization of Plaintiff's past work was not completely accurate and the evaluation of Plaintiff's mental capacity when on testosterone was less than clear.[4] Additionally, in reviewing the ALJ's evaluation of the three state-agency psychologists' opinions, the Court finds that the ALJ failed to provide a sufficient explanation for rejecting their opinions.

According to the Social Security Regulations, an ALJ is required to "consider *all* of the following factors in deciding the weight [to] give to *any* medical opinion[:]" (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c) (emphasis added); 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Generally, when evaluating a medical opinion, an opinion from a treating source with a treating relationship with the claimant is given the most weight. 20 C.F.R. § 404.1527(c)(2). Here, as the ALJ noted, Plaintiff did not have any opinions from a treating source. Next in the hierarchy of medical opinion testimony are opinions from examining sources, which are generally given more weight than medical opinions from non-examining sources, such as a state-agency consultants or medical experts. *See* 20 C.F.R. § 404.1527(c)(1), (e).

―――――――――――――――

[4] The Court will address the issue of Plaintiff's testosterone therapy treatment later in the opinion in relation to the ALJ's credibility determination.

Despite the requirements imposed by these regulations, the ALJ rejected the opinions of the consulting and examining psychologists without explicitly analyzing the checklist of factors to articulate the specific weight he ultimately gave these opinions. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (directing the ALJ to "explicitly" consider the checklist of factors and provide reasons for the weight given to the treating physicians' opinions on remand); *Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, at *25 (N.D. Ill. Aug. 4, 2015) (suggesting that the language provided in § 404.1527(c) is mandatory). The Commissioner suggests that the ALJ need only consider the checklist factors and provide "good reasons" for the weight given to the medical source's opinion. Dkt. 21 at 6. While the Seventh Circuit has not clarified conflicting case law on whether an ALJ must *explicitly* consider the factors,[5] here the ALJ's analysis is also deficient for failing to articulate what weight he gave to these opinions. *See* Social Security Regulation 96-6p (stating than an ALJ "must explain the weight given to [the opinions of a consulting psychologist] in their decisions").

Additionally, the reasons provided by the ALJ for rejecting these opinions are less than clear. *See Minnick v. Colvin*, 775 F.3d 929, 938-39 (7th Cir. 2015) (remanding where the ALJ failed to build a logical bridge necessary for the court to meaningfully review her reasoning because the decision was unclear and lacked evidentiary support). The ALJ determined that the opinions of Drs. Hermsmeyer and Taylor were "inconsistent with actual work history discussed below and the

---

[5] *Compare Henke v. Astrue*, 498 Fed. Appx. 636 (7th Cir. 2012) *with Yurt*, 758 F.3d 850.

clinical findings of [Dr. Hilger] who assigned a GAF of 65." R. 14. First, even though Dr. Hilger is an examining medical source, whose opinion would presumably be given more weight than that of a non-examining psychologist, the ALJ failed to articulate what "clinical findings" from Dr. Hilger were used to reject the functional limitations provided by Drs. Hermsmeyer and Taylor. *See* 20 C.F.R. § 404.1527(c)(1); *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir.2014) (finding that courts "await a good explanation" when an ALJ rejects an examining source's opinion in favor of a non-examining source's opinion).

The ALJ did reference the GAF score Dr. Hilger assigned, which the ALJ interpreted to mean that the alleged mental impairments had "only mild functional impact" on Plaintiff. R. 15. The ALJ made this determination despite the fact that Dr. Hilger explicitly found that Plaintiff's lack of motivation prevented him from performing activities involving understanding and memory, sustained concentration and persistence, social interaction and adaption. R. 527; *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that a GAF score does not necessarily reflect a doctor's opinion of functional capacity because the score measures severity of symptoms and functional level); *Anthony v. Astrue*, No. 09-3252, 2010 U.S. Dist. LEXIS 113807, at *35 (C.D. Ill. Oct. 26, 2010) (stating that GAF scores "are intended to be used to make treatment decisions, … not as a measure of the extent of an individual's disability" (internal quotations marks and citations omitted)). However, even if the ALJ's interpretation of the GAF score were accurate, Dr. Hermsmeyer specifically indicated that he reviewed Dr. Hilger's evaluation and the

GAF score and gave great weight to Dr. Hilger's opinion in providing his own assessment of Plaintiff's limitations. R. 545.

Second, although the ALJ found Drs. Hermsmeyer and Taylor's opinions inconsistent with Dr. Hilger's findings, the ALJ similarly rejected Dr. Hilger's opinions. The ALJ stated that "[a]lthough the undersigned will accept [Dr. Hilger's] assessment on the basis of the objective clinical findings from a one-time examination, there is reason to question their validity." R. 14. The ALJ determined that Dr. Hilger made his assessment without knowing Plaintiff's "complete work history" and having only Plaintiff's "account of information to guide him." R. 15. This determination leaves the Court to question what exactly the ALJ relied on to reject the functional limitations outlined in the Mental RFC and Psychiatric Review Technique provided by Dr. Hermsmeyer. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Moreover, the ALJ's reasons for questioning Dr. Hilger's opinions are not supported by substantial evidence. The ALJ rejected Dr. Hilger's opinions, in part, because he did not have a complete work history and relied on Plaintiff's self-reporting when evaluating Plaintiff. Dr. Hilger evaluated Plaintiff in forming his opinions, so while Plaintiff's description of his symptoms was a factor, it was not the only factor in Dr. Hilger's evaluation. *Cf. Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (stating that a physician's opinion that is based on nothing more than a claimant's own complaints is not a well-supported opinion). Additionally, Dr.

17

Hilger specifically referenced three of Plaintiff's most recent jobs, which were the same jobs the ALJ relied on to reject this opinion. R. 14. Dr. Hilger even noted that Plaintiff left his most recent job because he had a conflict with his boss, and not because of any inability to perform the job. R. 527. If the ALJ took issue with Dr. Hilger's failure to reference the vocational categorization of each of Plaintiff's jobs, the ALJ should have articulated this in his reasoning.

The ALJ should have also cited to the VE's classification of each of Plaintiff's jobs when using this to contradict Dr. Hilger's opinions. Instead, the ALJ relied heavily on his own interpretation of Plaintiff's work history. R. 14, 398. According to the ALJ, Plaintiff's work history as a rental clerk consisted of "semi-skilled work, necessarily requiring the ability to perform complex, detailed tasks, *including contract preparation and data entry*." R. 14 (emphasis in original). Contrary to the ALJ's description "[s]emi-skilled work is work which needs some skills but does not require doing the more *complex* duties." 20 C.F.R. § 404.1568(b) (emphasis added).[6] The VE also categorized this job as having a reasoning level of 3, which requires only a "commonsense understanding to carry out detailed but uninvolved written, oral, or diagrammatic form." DOT, App'x C, *available at* http://www.occupationalinfo.org/appendxc_1.html#II (last visited September 25, 2015).

---

[6] By comparison, "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed… [and] may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." 20 C.F.R. § 404.1568(c).

The ALJ also noted that Plaintiff previously worked as a lab technician and sold and installed window treatments, which the ALJ described as semi-skilled work "requiring the capacity to understand, remember and carry out complex, detailed instructions." R. 14. However, the VE classified the lab technician job and installation job as skilled work. R. 398. Additionally, Plaintiff's job selling window treatments was classified as semi-skilled, but the ALJ associated semi-skilled work with carrying out *complex* instructions, despite a lack of testimony from the VE that contradicts the definition of semi-skilled from the DOT. Based on the ALJ's mischaracterization of Plaintiff's work history, his determination that Plaintiff's alleged mental impairments had little effect on his ability to perform this work is not supported by substantial evidence. *See Castandeda v. Colvin*, No 11 C 5105, 2014 U.S. Dist. LEXIS 36303, at *21-22 (N.D. Ill. Mar. 17, 2014) ("As with other functional capacity findings, the ALJ must build a logical bridge between the evidence in the record and her conclusions regarding a claimant's ability to work despite mental limitations.").

The Commissioner does not address these inconsistencies, but instead argues harmless error because the ALJ's determination that Plaintiff could perform unskilled work as a lampshade assembler nevertheless accommodated Dr. Hermsmeyer's opinion that Plaintiff on perform simple one and two-step tasks. This is simply incorrect. Even though a lampshade assembler is unskilled work that requires the ability to do "simple duties", this position requires a reasoning level of 2. *See* 20 C.F.R. § 404.1568(a). A reasoning level of 2 involves a

commonsense understanding to carry out detailed, but uninvolved written or oral instructions, while a reasoning level of 1 only requires the ability to carry out *simple one or two-step instructions.*  DOT, App'x C, *available at* http://www.occupationalinfo.org/appendxc_1.html#II (emphasis added). Accordingly, the Commissioner's argument for harmless error is without merit.[7]

Therefore, the Court finds that the ALJ failed to provide a sufficient explanation for his assessment of the medical opinions in the record, thereby warranting remand for further consideration based on the issues outlined above.

## B. Credibility

Plaintiff next argues that the ALJ improperly assessed his credibility by dismissing his allegations regarding decreased motivation and swelling in his left leg.  Having already found legitimate grounds for remand, the Court will only briefly address Plaintiff's argument on this issue.

An ALJ's credibility determination should be reversed only if it is "patently wrong."  *Minnick*, 775 F.3d at 937 (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).  At the same time, a credibility determination may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record."  *Id.* (citations omitted).

---

[7] The Court notes that it is somewhat bemused by the position of lampshade assembler and the alleged number of those positions that exist in Illinois.  *See* R. 73.  But, the VE relied on the DOT for this information and is allowed to do so.  *See* 20 C.F.R. § 404.1566(d)(1) (permitting ALJs to take administrative notice of the DOT); 20 C.F.R. § 404.1566(e) (permitting an ALJ to employ a VE).  Despite some questioning of the DOT's validity by the Seventh Circuit (*see, e.g., Herrmann v. Social Security Administration*, 772 F.3d 1110, 1112-14 (7th Cir. 2014)), this Court is duty bound to follow presumptively valid statutes and regulations.  *See* 20 C.F.R. § 404.1566.

The Court admits that there are inconsistencies in the record regarding Plaintiff's description of treatment and symptoms and those described in the medical records, which may justify the ALJ's perhaps legitimate skepticism of Plaintiff's allegations regarding his impairments. However, in light of this Court's remand, the ALJ should take the opportunity to clarify the issues below.

In evaluating Plaintiff's impairments and RFC, the ALJ relied on Plaintiff's work history and the lack of supporting evidence in the record to determine that Plaintiff's allegations regarding his lack of motivation due to low testosterone were not completely credible. R. 16. Part of the ALJ's reasoning was based on Plaintiff's report to Drs. Hilger and Vlahos that he had not been on testosterone therapy for six years, or since approximately 2003. R. 512, 527. However, the record is less than clear on this issue. Plaintiff testified at the hearing that he was on testosterone therapy while working at Ed's Rental, which ended in 2006. R. 37, 383. Plaintiff's further testified that when he lost a job, he was unable to afford the testosterone, noting that he did not start receiving testosterone therapy again until 2012. R. 42. The ALJ observed that two notes in Plaintiff's medical records suggested that he may have begun testosterone therapy in 2010. R. 653, 667. However, paperwork completed by Plaintiff in 2011 indicated that he was still not receiving testosterone in jail. R. 381-82.

Despite the discrepancy between the medical records and Plaintiff's testimony, the ALJ did not question Plaintiff about this inconsistency during the hearing, leaving the record unclear as to whether Plaintiff was on testosterone

while working his last two jobs. On remand, the ALJ should seek clarification from Plaintiff on this issue, particularly because he relied on Plaintiff's ability to perform this work, arguably without the benefit of testosterone, to discredit Plaintiff's allegations of low motivation and related mental impairments. In light of Plaintiff's allegations that low testosterone contributes to his mental impairments, the ALJ should also seek clarification from Plaintiff on why he has not seen a psychologist or sought out psychotropic medications. *See* R. 14 (revealing that the ALJ was skeptical about Plaintiff's mental impairments due to his lack of treatment); s*ee Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (finding that an ALJ must not draw any inferences about a claimant's condition from his lack of medical care, "unless the ALJ has explored the claimant's explanations as to the lack of medical care").

The ALJ also discredited Plaintiff because a medical note from 2011 reported Plaintiff's complaint of low back pain due to shoveling snow while incarcerated. R. 16, 586. The ALJ noted that Plaintiff testified he was "medically-unassigned" in prison. R. 16. Aside from this one medical note, there is no additional information in the record regarding the circumstances of this situation and whether this was an isolated incident. If this were a reason to discredit Plaintiff, the ALJ should have at least questioned Plaintiff about this note at the hearing.

The ALJ also discredited Plaintiff's allegations of leg swelling, noting that although Plaintiff's weight would exacerbate his leg swelling, Dr. Vlaho's examination from 2009 did not document 2+ or 3+ indurations or pitting edema. R.

17.  But the ALJ failed to sufficiently explain why 2+ or 3+ indurations or pitting edema would be the only cause of Plaintiff's swelling.  Additionally, the ALJ noted that Plaintiff's most recent INR value was therapeutic and commented that "[i]t follows that clots or leg claudication should not pose the restriction [Plaintiff] asserts."  R. 17.  Again, there was no indication from the medical records or opinions that a therapeutic INR would alleviate Plaintiff's swelling.  Without explaining his reasoning behind these findings, the ALJ appears to have impermissibly played doctor by substituting his own opinion on the medical records.  *See Hamilton v. Colvin*, 525 Fed. Appx. 433, 437 (7th Cir. 2013) ("An ALJ's credibility determination is entitled to great deference, but it must be justified with specific reasons and have support in the record.") (citations omitted).  Therefore, on remand, the ALJ should further explain the reasons for discrediting Plaintiff's complaints of decreased motivation and leg swelling.

## IV. CONCLUSION

For the reasons stated in this opinion, this Court finds that remand is warranted so that the ALJ can build a logical bridge between the evidence in the record and his ultimate conclusions.  However, the Court expresses no opinion as to the ultimate determination of disability on remand.  An independent review of the entire record could result in a finding that Plaintiff is not disabled.  But this Court is foreclosed from engaging in that process.  See *Mason*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19.  Accordingly, Plaintiff's motion for summary judgment (Dkt. 16) is granted, and the Commissioner's motion (Dkt. 21) is denied.  The

decision of the ALJ is remanded for further proceedings consistent with this opinion.

Date: September 28, 2015     By:     _____
                                      Iain D. Johnston
                                      United States Magistrate Judge